IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | | |
|---|---|---|
| ROCIO JATSUEL CHAVEZ RODRIGUEZ, | ) ) ) | CV 12-167-M-DLC |
| Petitioner, | ) ) | |
| v. | ) ) | ORDER |
| PHILLIP A. SIELER, JR., | ) ) | |
| Respondent. | ) ) | |
| _____ | ) | |

Before the Court is Rocio Jatsuel Chavez Rodriguez's Amended Verified

Petition for Return of Child to Petitioner ("Petition").  The Petition is brought

pursuant to the October 25, 1980 Hague Convention on the Civil Aspects of

International Child Abduction (the "Hague Convention" or "Convention") and the

International Child Abduction Remedies Act, 42 U.S.C. §§ 11601–11610 (2011)

("ICARA"), which implemented the Convention in the United States.   The Court

held a hearing on October 31, 2012, and heard the testimony of Rodriguez,

Respondent Phillip A. Sieler, Jr., and an expert on Mexican law.  After considering the filings of the parties and the evidence presented at the hearing, it is ordered that both children, P.A.S.C. and C.J.S.C.[1], shall be promptly returned to Mexico, the children's habitual residence, so that a Mexican court may consider the question of custody.

## I.      Factual Background

Rodriguez is a Mexican citizen who has resided in the State of Nayarit, Mexico, most of her life.  She recently moved to the State of Jalisco.  Sieler is a United States citizen and currently resides in Kalispell, Montana, in the United States.  Rodriguez and Sieler met in Nayarit in 1996 when Sieler began doing mission work there through a church.  They were married by the church there on May 5, 1999, and were married legally in Kalispell on December 4, 1999.  For the next several months, Rodriguez and Sieler lived in Kalispell with Sieler's parents .  During this time, Rodriquez was granted temporary residency in the United States, and the couple raised funds from local churches so that they could return to Nayarit to build a church.

Rodriguez and Sieler returned to Nayarit in September 2002.  They lived

---

[1]The parties refer to the children by different initials. The Court will use the initials for both surnames of the children, to reflect all the names given on their birth certificates.

together in the house of Rodriguez's parents for the first few years while building

a church, and in 2005, a home, in the town of Ursulo Galvan. Sieler was a pastor

in the church and Rodriguez worked as a schoolteacher. Their monthly support

check from the church was deposited in a joint checking account at the Mountain

West Bank in Kalispell, Montana, and both Sieler and Rodriguez paid taxes to the

IRS and the Montana Department of Revenue.

In 2003, Sieler filed for an "FM3" as a non-immigrated visitor to Mexico

doing religious work. During the same year, Rodriguez was granted permanent

resident status in the United States. Thereafter, Rodriguez and Sieler returned to

the United States annually for four to six weeks at a time, usually during the

summers when the weather in Mexico was hottest. Sieler testified that as a

missionary, he knew his stay in Mexico would not be permanent. However,

Rodriguez testified that they never agreed how long they would reside in Nayarit

and that she did not believe a move was imminent because Sieler had told her that

he had been called to serve in Mexico.

Sieler's and Rodriguez's son, P.A.S.C.,was born in Mexico on December

20, 2004; he is now 7. C.J.S.C. was born on March 23, 2009; she is now 3. Both

children were registered as United States citizens born abroad and issued

American passports. However, they lived in Ursulo Galvan with both their parents

their entire lives, except for the few weeks a year that the family visited Kalispell. They lived close to Rodriguez's parents and siblings, with whom they spent significant time, and P.A.S.C. attended preschool and primary school there.

In July and August of 2011, the family made their typical summer trip to Kalispell. Sieler testified that at this time, he had begun to seriously consider moving the family back to Montana. During the visit, he decided he was going to move. Rodriguez testified that he did not tell her of his plan during this visit and that she would not have agreed to the move. Sieler insists he did tell her his intention and that while she was not angry, she was not happy about it either and that she neither said she would or would not come with him. The family returned to Mexico on August 20, 2011. Two days later, Sieler's father passed away, and Sieler returned to Kalispell to help settle his family's affairs. Rodriguez and the children joined him in late September, expecting to help out for a couple of months and then to return to Mexico.

Rodriguez testified that it was at this time that Sieler first told her he planned to move to Montana permanently. She denies ever agreeing to move or to allow the children to move to Montana. Sieler confirmed that Rodriguez never said she wanted the children to move to Montana permanently, although in his affidavit before the state court (doc. 27-1 at 1–2), he suggested that Rodriguez was

helping him prepare for a permanent move.  The parties agree that the proposed move caused or amplified tensions in their marriage that fall.

Rodriguez returned to Mexico with C.J.S.C. on December 25, 2011, because her sister was ill.  Sieler and P.A.S.C. returned to Mexico a month later.  P.A.S.C. re-enrolled in school in Nayarit.

The problems in Sieler's and Rodriguez's marriage continued in Mexico. For the next four months, Sieler continued to advocate moving the family to Kalispell, and Rodriguez continued to resist his plan.  She began contemplating separation.

On May 7, 2012, still in Nayarit, they argued late into the night.  During the argument, it appears that Rodriguez suggested that Sieler could take P.A.S.C. and that she could take C.J.S.C. if they separated.  Sieler contends she meant that he could take P.A.S.C. to the United States permanently.  Rodriguez denies she gave permission for Sieler to permanently remove P.A.S.C. from Mexico or her care. She testified that she meant that a short separation might help them resolve their difficulties and that they could each take care of one of the children during that separation.

When Rodriguez awoke the next morning, Sieler and both children were gone.  She had a text message from Sieler advising her to go speak with her

parents.  She did so and texted him back that the conversation had taken place.

She continued to try to reach him, but he did not respond.  She went to one of

Sieler's fellow missionaries who told her that Sieler had taken P.A.S.C. and

C.J.S.C. and left for the United States.  Sieler finally contacted Rodriguez from

Kalispell and informed her that neither he nor the children were returning to

Mexico.  Rodriguez did not agree to that arrangement.

Within days, Sieler initiated dissolution and custody proceedings in

Kalispell, and Rodriguez made efforts through the Mexican and United States

consulates in Guadalajara, Jalisco, Mexico, to initiate return proceedings.

Rodriguez's efforts resulted in the present case.  The state court proceedings in

Kalispell were stayed pending resolution of this petition.

## II.  Overview of the Hague Convention

Both Mexico and the United States are parties to the Hague Convention and

must therefore "take all appropriate measures" to expeditiously implement the

objects of the Convention.  Convention, art. 2.  The Convention was enacted "to

secure the prompt return of children wrongfully removed to or retained in any

Contracting State" and "to ensure that rights of custody and of access under the

law of one Contracting State are effectively respected in other Contracting States."

Convention, art. 1.  Its "drafters were concerned primarily with securing

international cooperation regarding the return of children wrongfully taken by a parent from one country to another, often in the hope of obtaining a more favorable custody decision in the second country." *Gonzalez v. Gutierrez*, 311 F.3d 942, 944 (9th Cir. 2002). To prevent an abducting parent from benefitting from his actions, a child who has been wrongfully removed or retained must be returned to the country of its habitual residence for custody proceedings. *In re B. Del C.S.B.*, 559 F.3d 999, 1002 (9th Cir. 2009). Thus, the question a court must answer is "*whether* a child should be returned to a country for custody proceedings and not *what* the outcome of those proceedings should be." *Holder v. Holder*, 392 F.3d 1009, 1013 (9th Cir. 2004).

The petitioner has the initial burden to establish by a preponderance of the evidence that the children were removed from the country in which they were habitually resident or that they were retained in another country in breach of the petitioner's custody rights. Convention, arts. 3–4. The burden then shifts to the respondent to establish an exception or defense. 42 U.S.C. § 11603(e)(2).

## III. Petitioner's case

### A. The habitual residence of both children is Mexico.

The determination of a "habitual residence" is a "mixed question of law and fact." *Mozes v. Mozes*, 239 F.3d 1067, 1073 (9th Cir. 2001). "Being habitually

resident in a place must mean that you are, in some sense, 'settled' there—but it need not mean that's where you plan to leave your bones." *Id.* at 1074. When determining a child's habitual residence, the Court must consider "the parents' present, shared intentions regarding their child's presence." *Id.* at 1076 n. 24 (citation omitted). Their intentions may be express or inferred through their actions. *Id.* at 1075. Where it is alleged that a child has acquired a new habitual residence, the Court must find the parents shared a "settled intention to abandon" the prior habitual residence. *Id.*

The habitual residence of both P.A.S.C. and C.J.S.C. is Mexico, where they were born and raised. Their citizenship is not determinative. *In re B. Del C.S.B.*, 559 F.3d at 1010 ("[A child's] current immigration status...cannot undermine all of the other considerations which uniformly support a finding that [he or she] is settled [somewhere]"). Both children resided in Ursulo Galvan in a house with their parents from the time they were born until they were removed to the United States by their father. Their family on their mother's side is in Nayarit, and P.A.S.C. attended preschool and primary school there. Though C.J.S.C. is very young, she was born in Mexico while her parents were habitually resident there. Thus Mexico was her initial habitual residence, *Holder*, 392 F3d at 1020–21, and no circumstances have changed that. The children visited Kalispell, Montana, on

summer vacations and when their paternal grandfather passed away, but they always returned to Mexico, and their parents never mutually agreed that they should move to Montana. Mexico provided the "family and social environment in which [the children's lives] developed." Elisa Perez-Vera, Explanatory Report ¶ 11, in 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426 (1982) ("Perez-Vera Report").

Sieler emphasizes that the work of a missionary is often transient, and that Rodriguez knew this when they were married. He also notes that the children are American citizens and that Rodriguez is a permanent resident of the United States, which requires a person to plan to reside permanently in the United States at some future point. Finally, he suggests that Rodriguez may have been equivocal at times about whether she would eventually agree to move the family to Montana. These facts do not alter the Court's conclusion, however. "[T]he decision to alter a child's habitual residence . . . cannot [be] accomplish[ed] through wishful thinking alone" or by unilateral action. *Mozes*, 239 F.3d at 1076, 1079. It is evident from both parties' testimony that when it came down to it, Rodriguez refused to move to the United States though Sieler insisted. Nor did she ever expressly or through her actions indicate that she intended either child to move permanently to the United States in May 2012. There is no evidence she made

arrangements to move herself or the children to the United States, and she consistently expressed disagreement with Sieler's intention to move.

Even if, during their argument on May 7, 2011, Rodriguez gave Sieler permission to take P.A.S.C. to the United States, the consent of the parent left behind "is not usually enough to shift" the child's habitual residence absent other circumstances from which the Court can infer a shared intent that the child abandon the previous habitual residence. *Id.* at 1078, 1081. Rodriguez denies any intent to allow the move to be permanent, and her testimony was entirely credible. It was not reasonable for Sieler to take Rodriguez's statement as permission to take either or both children from the country and her care permanently. Moreover, when Rodriguez woke to find the children and Sieler gone, she immediately objected and has persistently sought their return ever since. There is no evidence of a "shared, settled intent" that the children abandon their habitual residence of Mexico for a new habitual residence in the United States.

**B.  Rodriguez was exercising her rights of custody under Mexican law when the children were removed to the United States.**

There is no parenting plan, judicial or administrative decision, or other agreement regarding custody of P.A.S.C. and C.J.S.C. Thus, the law of the children's habitual residence—Mexico—governs the question of whether

Rodriguez has custody rights over the children.  Convention, art. 3.  Under the

Hague Convention, the Court may take direct notice of the law of the nation of

habitual residence and may rely upon affidavits and testimony of expert witnesses.

Convention, art. 14; 42 U.S.C. § 11605; Perez-Vera Report, ¶ 101.

　　Custody law in Mexico is based on the concept of "*patria potestas*" or

"*patria potestad*."  *Patria potestas* is common to all of Mexico's states, including

Jalisco, where Rodriguez is currently residing, and Nayarit, where the children

were born and raised.[2]   Decl. of Ignacio Pinto-Leon, doc. 16 at ¶ 19 (explaining

the right is common to all Mexican states and citing article 406 of the Nayarit

Civil Code, in particular); *Ramirez v. Buyauskas*, — F.Supp.2d —, 2012 WL

606746, *12–13 (E.D. Penn. Feb. 24, 2012) (discussing the custody law of Jalisco,

Mexico, recognizing the *patria potestas* right as a right of custody under the

Hague Convention, and citing other cases that have done the same).  *Patria*

*potestas* governs the relationship between parents and their children, conferring

upon both parents, jointly, the broadest possible right over their children's care,

custody, and well-being.  Doc. 16, ¶ 18; Title 8, ch. 1, art. 406 Nayarit Code;

---

[2]Rodriguez moved to Guadalajara, Jalisco, after Sieler took the children to the United States.  It is unclear whether she intends to continue to reside there or to return to Ursulo Galvan, Nayarit, and it is unclear in which state custody proceedings would take place.  Accordingly, the custody laws of both Jalisco and Nayarit are considered.  This does not impact the analysis of the children's habitual residence, which is Mexico.

*Ramirez*; 2012 WL 606746, * 12–13; *see also* Patricia Begne, *Parental Authority and Child Custody in Mexico*, 39 Fam. L.Q. 527 (2005); *Saldivar v. Rodela*, — F. Supp. 2d —, 2012 WL 2914833 (W.D. Tex. Jun. 22, 2012).

The *patria potestas* right has consistently and rightly been recognized as a right of custody under the Hague Convention. The Convention defines "rights of custody" to include rights relating to the care of the person of the child, and in particular the right to determine the child's place of residence." Convention, art. 5(a). The term "right of custody" is construed broadly under the Convention, *Abbott v. Abbott*, 130 S. Ct 1983, 1990 (2010), and, in both Nayarit and Jalisco, the right of *patria potestas* clearly encompasses the right to care for a child and determine the child's residence, *see* Nayarit Civil Code, art. 405, doc. 6-3 ("Parental authority/responsibility (*patria potestas*) is to be exerted over the children themselves as well as over their assets and is instituted for their care and protection."); *Ramirez*, 2012 WL 606746, * 13 (citing Jalisco Civil Code, art. 581). Additionally, the Nayarit Civil Code specifically provides that a child shall not leave the parents' residence without their permission, doc. 16, ¶ 17, and in Jalisco as well, both parents must consent to the removal of the child from the country. *Ramirez*, 2012 WL 606746, * 13.

Once custody rights are established, it is presumed that a person who has

care of her child is exercising her custody rights, and it is the respondent's burden to prove otherwise. Convention, art. 13(a); Perez-Vera Report, ¶ 73. There was no evidence presented that Rodriguez was not exercising her custody rights at the time the children were removed from Mexico in May 2012 or that she had lost those rights and responsibilities under articles 435 or 436 of the Nayarit Civil Code. Moreover, the children were living with both parents, as they had throughout their lives, up through the morning of their departure, and they were cared for by both Rodriguez and Sieler. Accordingly, Rodriguez has established that she has joint custody rights over P.A.S.C. and C.J.S.C. under Mexican law and that she was actually exercising those rights at the time of their removal.

**C.     Sieler wrongfully removed P.A.S.C. and C.J.S.C. to the United States and retained them here in violation of Rodriguez's joint custody rights.**

"[T]he removal of a child by one of the joint holders [of custody] without the consent of the other is wrongful, and this wrongfulness derives . . . not from some action in breach of a particular law, but from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise." Perez-Vera Report, ¶ 71. Alleging that the P.A.S.C. and C.J.S.C. were removed from Mexico without her consent, Rodriguez has established a prima facie case that there removal and retention in the United

States was wrongful.

## IV. Respondent's case

"Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."  42 U.S.C. § 11601(a)(4).  Sieler has the burden of establishing these defenses.  42 U.S.C. § 11603(e)(2).

### A.  Rodriguez did not consent to or acquiesce in the children's removal or retention.

The respondent must show by a preponderance of the evidence, that the petitioner "consented to or subsequently acquiesced in the removal or retention" of the children from their habitual residence.  Convention, art. 13(a); 42 U.S.C. § 11603(e)(2)(B).

Sieler has not met this burden.  He removed both P.A.S.C. and C.J.S.C. from Mexico without Rodriguez's consent.  He did so secretly, while Rodriguez was sleeping, and prevented her from learning of his plan until he was already out of the country.  Sieler admits that he did not have permission to take C.J.S.C. out of the country.  However, he insists that Rodriguez consented to his removal of P.A.S.C. based on her alleged statement, just hours before he took P.A.S.C. from the country, that they could separate and he could take care of P.A.S.C. and she

could take care of C.J.S.C.   This statement, made during a late-night argument, is not sufficient to establish consent to P.A.S.C.'s removal from Mexico.  There is no evidence the couple shared an understanding that P.A.S.C. would thenceforth live in the United States with Sieler.  Even if this disputed and broad statement could be construed as consent to take P.A.S.C. out of the country, Rodriguez immediately and vehemently objected to Sieler's retention of P.A.S.C. in the United States and his intent to keep both children here permanently.  Finally, Rodriguez's efforts to negotiate some settlement about the children's care and custody, despite Sieler's unilateral actions, cannot be construed as acquiescence in P.A.S.C.'s continued retention in the United States, particularly as no agreement was reached and Rodriguez persisted in her efforts to have both children returned to Mexico.

P.A.S.C. and C.J.S.C. were wrongfully removed from Mexico, in violation of Rodriguez's custody rights, on May 8, 2012 when Sieler took them out of the country or, at the latest, were wrongfully retained in the United States when Rodriguez objected to Sieler's plan to keep them in the United States permanently.

**B.     P.A.S.C. and C.J.S.C. will not face "a grave risk of physical or psychological harm" or be placed in an "intolerable situation" if they are returned to Mexico.**

Under Article 13(b) of the Hague Convention, a court is not bound to return

a child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Sieler urges the Court to apply this exception here based on increased violence in Mexico due to drug cartel activity:

> The once quiet State of Nayarit was under military control due to the cartels, there were bodies hanging off overpasses; random shootings throughout the city; and ambushes at police check points. Sieler's sister-in-law was caught in a shooting at the grocery store in which 8 people were killed and many others wounded. Kidnappings, home invasions, and robberies greatly increased.

Response in Opp. to Pet. for Return of Children, doc. 19 at 3. The same sister-in-law was later robbed at knife point in her home, which is close to the children's grandparents' house where Rodriguez and the children spent a significant amount of time. Additionally, Sieler alleges that his brother-in-law might be involved in a drug cartel and that the house across from the family's home in Ursulo Galvan is a "drug house." Finally, he notes that houses in Nayarit as well as the rest of Mexico typically have reinforced doors and bars on the windows and that children are taught in school what to do if a shooting takes place. Sieler indicates that he has read about the general increase in violence in newspapers of general circulation and warnings from the United States Department of State, and that he has heard stories of kidnappings and other incidents from church members and

friends.  Rodriguez testified that much of the violence Sieler describes has

occurred in Tepic, the capital of Nayarit, which is two and half hours from Ursulo

Galvan.

"[L]ike the other exceptions," the grave-risk exception is "'drawn very

narrowly lest [its] application undermine the express purposes of the

Convention—to effect the prompt return of abducted children.'"  *Gaudin v. Remis*,

415 F.3d 1028, 1036 (9th Cir. 2005) (quoting U.S. Dept. of State, Hague

International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg.

10,494, 10,509 (Mar. 26, 1986)).  The risk must be "grave, not merely serious," *id.*

(citation omitted), and the exception should only be applied in "extreme cases,"

*Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010).  Educational or economic

opportunities or other such advantages are not appropriate considerations under

the grave-risk inquiry.  *Blondin v. Dubois*, 238 F.3d 153, 161–62 (2d Cir. 2001);

*Cuellar*, 596 F.3d at 511.  Additionally, "because the Hague Convention provides

only a provisional, short-term remedy in order to permit long-term custody

proceedings to take place in the home jurisdiction, the grave-risk inquiry should be

concerned only with the degree of harm that could occur in the immediate future."

*Gaudin*, 415 F.3d at 1037.

The Sixth Circuit has held that a grave risk of harm can be found "when

return of the child puts the child in imminent danger *prior* to the resolution of the

custody dispute—e.g., returning the child to a zone of war, famine, or disease."

*Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996).   Courts have

construed this standard narrowly, in conformance with the goals of the Hague

Convention.   In *Silverman v. Silverman*, for example, the Eighth Circuit rejected

the district court's finding that Israel constituted a "zone of war" warranting the

application of the grave-risk exception, holding that there must be "specific

evidence of potential harm to the individual children."   338 F.3d 886, 900 (8th Cir.

2003) (citation omitted).   Allegations of "general regional violence, such as

suicide bombers, that threaten everyone in Israel" were "not sufficient."   *Id.* at

901.

In a similar vein, at least two district courts have considered facts strikingly

similar to those alleged by Sieler.   In *Vazquez v. Estrada*, the district court rejected

the respondent's argument that returning the child to Monterrey, Mexico, would

expose her to a grave risk of physical harm due to the "'spiraling violence and

surge in murders in Monterey' and because of 'specific violent acts that have been

committed in the school [the child] attended in Monterrey and in the neighborhood

where Petitioner resides.'"   2011 WL 196164, *5 (N.D. Tex. Jan. 19, 2011).   A

surge of violent activity, drug cartel activity, and a dangerous neighborhood were

not sufficient to find that Monterrey was a "zone of war." *Id.* Likewise, the district court in *Castro v. Martinez* held that the respondent failed to allege a grave risk when he alleged, among other things, that the area was burdened by drug cartel activities, the child had seen a Mexican police officer arrest and possibly beat an individual; the petitioner's home was unsafe; the child possibly saw violent acts in Mexico; and one or more of the mother's relatives may be members of a "gang cartel." — F.Supp. 2d —, 2012 WL 359901, *2 (W.D. Tex. Feb. 2, 2012)*. See also Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1365–66 (civil instability and violent demonstrations in Argentina did not amount to a "grave risk" or "intolerable situation"); *Avendano v. Smith*, 2011 WL 5223041, *22 (D.N.M. Aug. 19, 2011) ("[A]lthough Mexico is more dangerous than the United States at this time, the term intolerable situation was not meant to encompass return to a home where living conditions are less palatable."); *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603 (E.D. Va. 2002), *aff'd without opinion*, 52 Fed. Appx. 207 (4th Cir. 2002) (holding there was no clear and convincing evidence of serious danger to a 13-year-old Colombian national who also held U.S. citizenship when he had lived in Colombia without incident for over a year and had friends and family there, even though kidnapping of United States citizens had increased and his father had been specifically threatened).

The respondent bears the burden of proving a grave risk or intolerable situation by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). All facts that support the exception must also be established by clear and convincing evidence. *Cuellar*, 596 F.3d at 509. Sieler has not met this burden. He did not present "specific evidence of potential harm to the individual children" and most of his concerns are based on second- and third-hand accounts of violence in the region. *Silverman*, 338 F.3d at 900. His allegations are even less specific than those in *Vazquez* and *Castro*, and are not sufficient to satisfy Article 13(b)'s narrow exception. Similarly, Sieler's sincere but speculative concerns for his children's safety due to their citizenship and mixed heritage do not demonstrate a "grave risk" of "immediate" physical or psychological harm. *Gaudin*, 415 F.3d at 1037. Finally, Sieler's concerns that he may be arrested or that Rodriguez's family or a drug cartel may harm him if he returns to Mexico do not show that the *children* would be at risk. *See Stirzaker v. Beltran*, 2010 WL 1418388, * 9 (D. Idaho Apr. 6, 2010). The grave-risk exception must be "interpreted in a restrictive fashion if the convention is not to become a dead letter," Perez-Vera Report, ¶ 34, and the Court is not convinced that returning the children to Mexico, where they have lived their entire lives, would place them in harm's way, much less put them in a truly grave or intolerable situation.

**C.    Returning P.A.S.C. and C.J.S.C. to Mexico will not violate fundamental principles relating to the protection of human rights and fundamental freedoms.**

A court is not required to return a child to its habitual residence when the return "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Convention, art. 20.  In its Public Notice concerning the Hague Convention, the United States Department of State emphasizes the "always clearly exceptional nature of this provision's application" and that the exception "is not to be used . . . as a vehicle for passing judgment on the political system of the country from which the child was removed."  U.S. Dept. of State, Hague International Child Abduction; Text and Legal Analysis, Public Notice 957, 51 Fed. Reg. 10,494, 10,510 (1986).  The exception is construed even more narrowly than the grave-risk exception.

Sieler contends the exception applies because "[t]he due process rights and fundamental freedom of Nayarit and Mexico in general are not at the same high level as the United States," he may face charges in Mexico and be arrested if he returns, he believes he would be in danger in Mexico, and he cannot access the judicial system in Mexico.  Sieler has provided no evidence, except his own speculation, to support his allegations and has therefore failed to establish the

Article 20 exception by clear and convincing evidence. 42 U.S.C. §

11603(e)(2)(A). *See also Stirzaker v. Beltran*, 2010 WL 1418388, * 9 (D. Idaho

Apr. 6, 2010) (rejecting the respondent's argument that corruption in Mexico

would prevent her from obtaining a fair trial as being "precisely the thing the

Convention seeks to prevent," that is, "crossing borders in search of a more

sympathetic forum for child custody proceedings") (citation omitted); *Mendez

Lynch*, 220 F. Supp. 2d 1347, 1365 ("Respondent has failed to produce sufficient

evidence that the current situation in Argentina comes within this affirmative

defense.").

## V. Conclusion

Rodriguez has more than met her burden under the Hague Convention and

ICARA, and Sieler has not satisfactorily established any affirmative defense.

Accordingly, the Court finds that the habitual residence of both P.A.S.C. and

C.J.S.C. is Mexico, and Sieler's retention of the children in the United States is

wrongful. The children must be returned to Mexico. Convention, art. 12.

Pursuant to Article 19 of the Hague Convention, this decision is not a

determination on the merits of any custody issue.

IT IS ORDERED:

1. Petitioner Rocio Jatsuel Chavez Rodriguez's Amended Verified Petition

for Return of Child to Petitioner (doc. 6) is GRANTED.

2. Respondent Phillip A. Sieler, Jr. shall surrender custody of P.A.S.C. and C.J.S.C. to Rodriguez within seven (7) days of this Order, together with their birth certificates and passports.

3. P.A.S.C. and C.J.S.C. shall be returned to Mexico, where a custody determination can be made by a Mexican court under Mexican law.

3. Sieler shall pay all necessary expenses incurred by or on behalf of Rodriguez in this action pursuant to 42 U.S.C. § 11607(b)(3).

Dated this 7th day of November 2012.


_Dana L. Christensen_

Dana L. Christensen, District Judge
United States District Court